**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT KNOXVILLE**

| | | | |
|---|---|---|---|
| JEROME DOOLEY, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | No.: | 3:23-CV-266-KAC-JEM |
| | ) | | |
| KNOX COUNTY SHERIFF'S | ) | | |
| DEPARTMENT, et al. | ) | | |
| | ) | | |
| Defendants. | ) | | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, a prisoner intermittently housed in the Knox County Detention Facility, is proceeding pro se and *in forma pauperis* on an Amended Complaint [Doc. 5], as supplemented [Docs. 6, 7], under 42 U.S.C. § 1983 [*See* Docs. 8, 10, 19]. As set forth below, the Court dismisses certain claims and Defendants but permits Plaintiff to proceed on his claims for (1) denial of adequate medical care against Nurse Trent, (2) failure to protect against Officer Anderson, and (3) violation of equal protection by Officer Thornburry.

**I.      Screening Standard**

Under the Prison Litigation Reform Act ("PLRA"), district courts must screen prisoner complaints and *sua sponte* dismiss any claims that are frivolous or malicious, fail to state a claim for relief, or are against a defendant who is immune. *See, e.g.,* 28 U.S.C. §§ 1915(e)(2)(B) and 1915A; *Benson v. O'Brian*, 179 F.3d 1014 (6th Cir. 1999). The dismissal standard articulated by the Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) "governs dismissals for failure to state a claim under [28 U.S.C. §§ 1915(e)(2)(B) and 1915A] because the relevant statutory language tracks the language in Rule 12(b)(6)" of the Federal Rules of Civil Procedure. *Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010). Thus, to

survive an initial review under the PLRA, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

Allegations that give rise to a mere possibility that a plaintiff might later establish undisclosed facts supporting recovery are not well-pled and do not state a plausible claim. *Twombly*, 550 U.S. at 555, 570. Further, formulaic and conclusory recitations of the elements of a claim that are not supported by specific facts are insufficient to state a plausible claim for relief. *Iqbal*, 556 U.S. at 681. Similarly, an allegation that does not raise a plaintiff's right to relief "above a speculative level" fails to state a plausible claim. *Twombly*, 550 U.S. at 570. However, the Supreme Court has instructed that courts should liberally construe pro se pleadings filed in civil rights cases and hold them to a less stringent standard than "formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520 (1972).

## II.   Plaintiff's Relevant Allegations[1]

Plaintiff was indicted for three counts of rape in 2019 and apparently released on bond pretrial [Doc. 5 at 4-5]. On February 24, 2023, his bond was revoked [*Id*. at 28-31]. Plaintiff was house at the Roger D. Wilson Detention Facility pretrial from February 24, 2023 to March 3, 2023 [*Id*. at 31, 32, 34]. During that week, Plaintiff was (1) only allowed out of his cell for a total of three hours, (2) "not adequately furnished [his] medication[,]" (3) given cheese sandwiches despite the fact that he is lactose intolerant, and (4) denied mental health services [*Id*. at 31].

---

[1] For the reasons explained below, the Court omits the details of Plaintiff's misjoined claims regarding his Knox County criminal prosecution here.

2

On March 3, 2023, Plaintiff pled guilty[2] and was released on probation [*Id*. at 32, 34]. Plaintiff maintains that the deprivation of food and medication during the week he spent incarcerated cause him to plead guilty [*Id*. at 17]. Plaintiff lived with his girlfriend until April 2, 2023, when he was arrested for violating a "no contact" order [*Id*. at 36]. He bonded out two days later [*Id*. at 36]. On April 14, 2023, Plaintiff was arrested on a "violation of probation warrant" [*Id*.].

Following his arrest, Plaintiff returned to the Roger D. Wilson Detention Facility, where he was not given his prescription medication "by medical staff despite them showing me [him] that they had my [his] medications on file from the last time" he was incarcerated [*Id*. at 37]. Plaintiff submitted several medical requests and grievances concerning his medication [*Id*. at 37-38]. Plaintiff had a seizure on April 21, 2023, as a result of being unmedicated [*Id*. at 38]. Plaintiff's cell mate alerted officers, who rushed Plaintiff to medical [*Id*.]. When Plaintiff arrived at medical, the holding cell had bugs crawling around, smelled of urine, and neither the toilet nor the sink worked [*Id*.]. Plaintiff had no shoes and could only sit on the floor or on a concrete slab that was "infested with bugs" [*Id*.].

Nurse Trent came to the holding cell and stated, "You know I put in for you to start your meds over, so this was all unnecessary" [*Id*.]. Nurse Trent also called Plaintiff a "jackass" and a "stupid little bitch" [*Id*.]. Plaintiff stated, "[B]et I'll see you in court[,]" to which Nurse Trent replied, "I'm not scared of any lawyer. Who's your[]s anyway?" [*Id*.]. Plaintiff responded,

---

[2] Plaintiff does not state the exact charge he pled to, but the Tennessee Department of Correction lists his Knox County convicted offense as "sexual battery." *Tenn. Dep't of Corr*., "Felony Offender Information," https://foil.app.tn.gov/foil/details.jsp (last visited December 6, 2024).

"Someone you should fear" [*Id.*]. Nurse Trent retorted, "Ha! You don't have one! Now shut the fuck up before I leave you there all night" [*Id.*]. Plaintiff was eventually returned to his cell [*Id.*].

Plaintiff was served cheese sandwiches despite informing staff that he was lactose intolerant [*Id.*]. On April 20, 2023, he submitted a grievance stating that the kitchen informed a pod officer that Plaintiff was "shit out of luck" if he wanted an alternative to the cheese sandwiches [*Id.* at 38-39]. On April 22, 2023, Plaintiff's prescription for Depakote was restarted, and his prescription for Hydroxyzine was restarted on April 25, 2023 [*Id.* at 39].

On an unidentified date, Plaintiff got into an altercation with another inmate and was rehoused back to classification [*Id.*]. Even though he had no disciplinary charges against him, Plaintiff was housed in "disciplinary classification" and slept on the floor of a one-man cell with two other men [*Id.*]. Plaintiff "asked to be moved to an empty cell, but was told no by many officers" [Doc. 5 at 39]. Plaintiff, however, "began to see white inmates moved to empty cells, and only two people be in those cells" [*Id.*].

At some point, Plaintiff, a black man, was denied recreation by Officer Letter because he was reclassified to general population, even though he had spent three consecutive days in an overcrowded cell [*Id.*]. Plaintiff was also denied contact with his Nashville attorney [*Id.* at 40]. Plaintiff's attorney placed three separate transport orders to resolve Plaintiff's charges, but those orders were ignored by the Knox County Sheriff [*Id.*]. White inmates, however, were transported to "take care of out of county charges" [*Id.*]. Plaintiff filed a request that was denied in late April 2023 [*Id.*].

Plaintiff was moved to general population on May 2, 2023 [*Id.*]. Plaintiff was denied his evening medications on May 7, 2023, "after the nurse was upset she could not hear [Plaintiff] say [his] name as well as point to it" [*Id.*]. Plaintiff filed a grievance and a sick call [*Id.*].

4

On May 10, 2023, Plaintiff asked the "money clerk" to refund the ten dollar ($10) sick call fee he was charged in association with the seizure he experienced, claiming that (1) the seizure was caused by the staff's failure to give him proper medication, (2) he did not make a sick call, and (3) he "was not treated only taunted" [*Id.*]. Plaintiff filed a grievance on May 14, 2023[3], and was told that he "'pretended' to have a seizure" [*Id.*]. Plaintiff appealed the response and was told that "being seen is worth $10" [*Id.*]. Plaintiff appealed a second time on May 20, 2023, stating he was taunted, "not seen" [*Id.* at 40-41]. "At this time,"[4] the inmates were held in their cells "for over four days without the opportunity to shower, exercise, or socialize" [*Id.* at 41]. The inmates were also not allowed to charge their tablets to speak with family members [*Id.*]. "This caused [Plaintiff] anxiety attacks and mental suffering" [*Id.*].

On May 20, 2023, Plaintiff filed another grievance after Officer Cordova called Plaintiff a "ni**er" and threatened that he would find a reason to give Plaintiff a disciplinary write-up [*Id.*]. Plaintiff's grievance also included his complaints regarding "the inability to take care of hygiene" and "how the mental health team refuses to help inmates" but merely threatened to strip their clothes and put them in paper gowns [*Id.*]. The staff responded by telling Plaintiff that he could not grieve multiple issues on the same form [*Id.*].

On May 25, 2023, Plaintiff got into a verbal altercation with inmate Sanderson during recreation time [*Id.* at 43]. Plaintiff and Sanderson went into Sanderson's cell to fight, but neither wanted to fight [*Id.*]. Sgt. Hocker opened the door and ordered the inmates to get on the floor [*Id.*].

_____

[3] Plaintiff states that he filed the grievance on May 14, 2022, [Doc. 5 at 40], but based on Plaintiff's timeline of events, the Court presumes Plaintiff inadvertently recorded the wrong year.

[4] Plaintiff's allegations confirm that he was out of his cell on May 18, 2023, for a court proceeding, so it is unclear exactly when this four-day period transpired [Doc. 5 at 41, 42]. The Court presumes, however, that it occurred near the other May 2023 events.

Plaintiff and Sanderson complied, but only Plaintiff was detained "while the white inmate was sympathized [with] and asked was he okay" [*Id.*]. Sgt. Hocker was not wearing a body camera and allegedly gave three different accounts of what happened [*Id.*]. Plaintiff received a disciplinary write-up for a physical altercation, even though no physical altercation occurred [*Id.*]. Plaintiff was placed in an isolation cell and told by an unidentified lieutenant that Plaintiff would sleep on metal without a mattress if he "acted a fool" [*Id.*].

Corporal Reese asked Plaintiff what the inmates fought about [*Id.*]. Plaintiff replied that they did not fight, and Sgt. Hocker "looked mockingly and smacked his lips" [*Id.*]. A medical staff member came and asked Plaintiff if he needed medical treatment [*Id.* at 43, 46].[5] When Plaintiff stated, "No, because we did not fight[,]" the Lieutenant yelled at him to "answer the damn question!" [*Id.* at 46]. Plaintiff told the Lieutenant that he did not have to speak to him "that way" [*Id.*]. Plaintiff was then placed in isolation for thirty minutes [*Id.*].

Plaintiff asked Sgt. Hockner for his name, and when he told Plaintiff, Plaintiff stated, "Bet[,] I gotchu [sic]" [*Id.* at 46]. Sgt. Hockner kept asking what Plaintiff meant, assuming Plaintiff was threatening him [*Id.*]. Plaintiff "felt that [his] skin color made [him] seem like a threat because the other inmate was not restrained nor talked to like [Plaintiff] was" [*Id.*]. Plaintiff told Sgt. Hockner that "God doesn't like ugly" [*Id.*]. Sgt. Hockner responded, "God loves me, he hates you" and laughed [*Id.*]. Plaintiff wrote a grievance and was told that he "was treated like that because" only one set of restraints were available at the time [*Id.*].

Plaintiff remained in disciplinary confinement until his disciplinary hearing on June 1, 2023 [*Id.*]. During the hearing, Plaintiff explained to Cpl. Kuban that there was no altercation [*Id.*]. Cpl. Kuban stated that Plaintiff was guilty "because it looked like a fight could have occurred and

---

[5] The pages of Plaintiff's Amended Complaint recounting these allegations are out of order.

more often than not it did" [*Id*.].  Plaintiff asked if anyone spoke to witnesses, and Cpl. Kuban stated that he trusted the other inmate's version of events more than Plaintiff's [*Id*. at 44, 46].[6]  An officer at the desk stated that the other inmate came to medical with bruises [*Id*. at 44].  Plaintiff "called him on his lie and asked his name" [*Id*.].  The desk officer stated, "I've worked here for over 25 years[.]  I have no reason to lie; and it[']s officer 'Fuck around and find out!'" [*Id*.].  When Plaintiff stated that it was "not right how they made up that [he] hit Sanderson[,]" the officer stated, "I didn't say you hit him" [*Id*.].  Plaintiff asked, "[t]hen what's the purpose of bringing that up?" [*Id*.].  Cpl. Kuban said that Plaintiff had a scar on his left eye that was proof of the altercation, but Plaintiff maintains that the scar was present in his mugshot before he entered prison [*Id*.].  Nonetheless, Plaintiff was "restricted" for thirty days [*Id*.].

Sanderson told other inmates about Plaintiff's sex charges to get gang members to "jump" Plaintiff during recreation [*Id*.].  Plaintiff filed several grievances to be moved from an incompatible inmate [*Id*.].  Plaintiff was moved to "ID, the hole[,]" but Sanderson was later moved to "the hole" as well [*Id*.].  Plaintiff asked to be separated from "incompatibles" and was told that the only solution was to place Plaintiff in protective custody, which Plaintiff declined because it would still not solve the problem in his view [*Id*.].

On June 4, 2023, Plaintiff began to have anxiety attacks, but because he was in the hole, he could not contact anyone [*Id*. at 44-45].  Plaintiff pressed the emergency button in his cell and asked for anxiety medication or to see mental health, and Officer Anderson came over the intercom and told Plaintiff he could only go to mental health if he was suicidal [*Id*. at 45].  Officer Cordova then turned on everyone's cell lights, and Plaintiff's sensitivity to light was triggered [*Id*.].  Plaintiff hit the emergency button again and begged to see medical staff, but Officer Anderson told him

---

[6] The pages recounting this event are out of order.

7

"That's not an emergency" [*Id*.]. Plaintiff continued pressing the button, and Officers Anderson and Cordova "were going back and forth threatening to shoot [Plaintiff], take [his] clothes, and more" [*Id*.]. Officer Anderson called Plaintiff a "rapist" and used the intercom to tell other inmates that Plaintiff had a rape charge [*Id*.]. Officer Anderson then told Plaintiff he was a "turd baby" and was "browner than the shit in the toilet" [*Id*.]. When Plaintiff asked Officer Anderson (whose name was then unknown to Plaintiff) his name, Officer Anderson replied, "I'm Jesus" [*Id*.]. Plaintiff stopped pressing the button and "went to write" [*Id*.]. However, Officer Anderson kept buzzing Plaintiff's cell every two to three minutes asking, "What is your medical emergency?" [*Id*.]. Officer Anderson then turned on the audio to the Heat-Nuggets NBA finals game for at least an hour [*Id*.]. Officer Cordova came to Plaintiff's cell, called Plaintiff a "fucking weirdo[,]" and asked, "What's wrong with you?" [*Id*.].

On June 5, 2023, after Plaintiff returned to the detention facility from court, [*id*. at 47, 54], Plaintiff requested his medication because he was experiencing an anxiety attack and had not received his medication that morning, [*id*. at 54]. Plaintiff was patted down and told to check in with his correctional officer [*Id*. at 54-55]. Officer Johnson informed Plaintiff that medical would not "let [him] come" [*Id*. at 55]. Plaintiff pressed the emergency button "to beg for meds" and was told that he could only get them if he was going to hurt himself [*Id*.]. Plaintiff said, "I don't know" and was taken to Six Building, where his clothes were taken [*Id*.]. Plaintiff was placed in a suicide cell and given a paper gown to wear [*Id*.]. Plaintiff used toilet paper to keep warm [*Id*.]. The hot water did not work inside the cell, and he was only given a cheese sandwich to eat [*Id*.].

Plaintiff was advised that he could only receive one paper gown per shift, so he received one during second shift and requested one from Officer Thornburry during third shift [*Id*.]. Officer Thornburry stated that he would get Plaintiff a gown "in a few," but thirty minutes passed, and

Plaintiff asked again [*Id.*].  This time, Officer Thornburry stated, "Hold on[,] I got a lot to do" [*Id.*].  An hour later, Plaintiff asked Officer Thornburry again for a gown [*Id.*].  Officer Thornburry stated, "Now you're going to wait because you rushed me" [*Id.*].  Plaintiff pressed the intercom button and told the officer who answered that he "felt the pod officer had a prejudice against [him]" [*Id.* at 56].  "The intercom officer agreed to get something done" [*Id.*].  After another ninety minutes passed, Plaintiff pressed the intercom button until he received a response [*Id.*].  But instead of providing Plaintiff assistance, the intercom officer "kept clicking the intercom" [*Id.*].  Officer Thornburry then "got on the intercom and said that [Plaintiff] pissed him off and that he wasn't getting [Plaintiff] a gown" [*Id.*].  Officer Thornburry came to Plaintiff's cell and called him a "little black bitch" after he turned off his body camera [*Id.*].  He then threatened to strip Plaintiff naked [*Id.*].  Officer Thornburry gave a white inmate toilet paper and a gown, "so I [Plaintiff] called him racist" [*Id.*].

At around 5:30 a.m., (presumably the following day, June 6th) Officer Thornburry opened the flap to Plaintiff's cell door and "threw an orange" at Plaintiff's groin [*Id.*].  Plaintiff threw it back [*Id.*].  Officer Thornburry then crushed Plaintiff's food with his hands and threw it on Plaintiff's cell floor [*Id.*].  Plaintiff filed a grievance concerning the incident, and the response stated, "I will speak to Officer Thornburry and Officer Willis about interactions that occurred on June 5.  However, keep in mind that all officers have until the end of their shift to hand out any hygiene items, paper gowns, laundry, etc.  [I]t is not required that it happen as soon as an inmate asks for it" [*Id.* at 56-57].

On June 13, 2023, Officer Thornburry served breakfast [*Id.* at 58].  When he arrived at Plaintiff's cell, he "held [Plaintiff's] food away" and asked, "You're not going to throw an orange again are you?" [*Id.*].  Plaintiff viewed the comment as an indication that Officer Thornburry "was

9

trying to tamper with [Plaintiff's] food" [*Id*.].  Plaintiff filed a grievance about the incident, and he also appealed an earlier grievance concerning Officer Thornburry that determined Officer Thornburry had "handed [Plaintiff his] food normally" [*Id*.].  Plaintiff maintains that the grievance officers relied on far-away security footage rather than the body camera footage to reach that determination [*Id*.].  When Plaintiff appealed again, maintaining that the officers all lied for each other and could not be trusted, he received no response [*Id*.].

Plaintiff "was soon moved back to ID" and could not communicate with his family, which worsened his depression and anxiety [*Id*.].  Plaintiff could not sleep, felt little desire to eat, and "wanted to end it all" [*Id*.].

On June 19, 2023, Officer Martinez served breakfast [*Id*. at 59].  Usually, officers will leave the cell flaps open while serving breakfast trays so that the inmate can put the tray back out of the cell when he is finished [*Id*.].  Officer Martinez, however, closes the flaps after he serves food [*Id*.].  When Plaintiff attempted to hand his milk back to Officer Martinez (due to his lactose intolerance), he dropped it when Officer Martinez tried slamming the cell flap [*Id*.].  After he ate, Plaintiff put the tray on the ground and got into his bunk [*Id*.].  When Officer Martinez returned and asked for the tray, Plaintiff, who is disoriented by his medication at times, told Officer Martinez that the tray was by the door [*Id*.].  Officer Martinez turned off his body camera and told Plaintiff, "You're gonna bring me it" [*Id*.].  Plaintiff stated that he could not get back up, and Officer Martinez responded, "I'm gonna beat the fuck out of you[,] you pussy black piece of shit" [*Id*.].  Plaintiff told Officer Martinez "to grab the tray while he's at it" [*Id*.].  Officer Martinez walked off calling Plaintiff a "stupid black bitch" [*Id*.].

Plaintiff filed a grievance concerning the event with Officer Martinez, and the reply stated: "Officer Martinez denies making these statements and has been reminded professionalism is the

expectation of all officers. He states [Plaintiff] attempted to throw a milk at him and he said 'don't do that again or you're not gonna like it.'" [*Id*. at 59-60]. Plaintiff states this is untrue [*Id*. at 60]. The response also stated, "Considering the officer you are grieving is also a minority, your race has no bearing on his conduct or this grievance" [*Id*.]. Plaintiff contends that "the grievance [response] expresses the policy and customs of racial prejudice in the Knox County Sheriff's Department," and he filed another grievance advising that (1) officers were not precluded from being racist merely because they were minorities, (2) Officer Martinez lied, and (3) it was illegal for Officer Martinez to turn off his body camera [*Id*.]. The response to that grievance stated that Plaintiff's grievance was not clear, and that he needed to list specific incidents [*Id.*].

On June 29, 2023, Cpl. Harvey "came into the pod with hostility and began taking it out on inmates, especially black inmates" [*Id*. at 6]. While Plaintiff was getting his medications, he saw an empty laundry bag on the table and picked it up [*Id*.]. Cpl. Harvey told Plaintiff to put the bag down, so Plaintiff did [*Id*.]. Cpl. Harvey said that "everything is his including me" [*Id*.]. Plaintiff told Cpl. Harvey, "[Y]ou don't own me" and confirmed Cpl. Harvey's name before yelling, "[B]et I'm filing a grievance" [*Id*.]. Cpl. Harvey then entered Plaintiff's cell and stated he was writing Plaintiff a disciplinary infraction for theft [*Id*.]. Plaintiff video called his father as a witness, and Cpl. Harvey left, calling Plaintiff "a little boy" [*Id*. at 6]. Plaintiff pressed the intercom and stated he thought Cpl. Harvey was profiling and being racist [*Id*.]. Cpl. Harvey then "got mad and threatened [Plaintiff with] another write-up" [*Id*.].

Plaintiff grieved Cpl. Harvey's conduct, and Cpl. Harvey denied any wrongdoing [*Id*. at 7]. Plaintiff appealed the write-up, claiming that he did not steal anything [*Id*.]. In a grievance response, Plaintiff was advised that the Inmate Handbook defines theft as "obtain[ing] control over the property of another" [*Id*.]. Plaintiff, however, maintains that the bag was not anyone's property

because no one knew to whom the bag belonged [*Id*.].  Plaintiff argues the legal definition of theft includes "the intent to steal," while the Inmate Handbook's definition overbroadly applies to any control over property [*Id*.].  Plaintiff was "prejudicially singled out" and placed on a five-day restriction from external communication to prevent him "from reporting anything" [*Id*.].  Plaintiff maintains that two white inmates were not disciplined even though pod officers knew they went into other inmates' cells and stole commissary [*Id*. at 8].

On July 11, 2023, Plaintiff and other inmates asked to clean the pod [*Id*.].  Officer Anderson told Plaintiff and another black inmate that the pod was not getting cleaned that night but later he let four white inmates out to clean [*Id*.].  A black inmate called Officer Anderson racist [*Id*.].  Officer Anderson stopped at Plaintiff's cell door, and when Plaintiff asked if Officer Anderson had any mail for Plaintiff, Officer Anderson replied, "Fuck no!" [*Id*.].  About five minutes later, Officer Anderson returned and handed Plaintiff mail from this Court [*Id*.].  Officer Anderson has given Plaintiff's mail "to other inmates before without checking" [*Id*.].

Later that evening, Officer Perry did head count at 11:00 p.m., and he demanded people wake up and come to their cell doors [*Id*.].  Plaintiff's medications had "kick[ed] in[,]" and he could not get off of his top bunk [*Id*.].  Officer Perry stated Plaintiff's name, asked Plaintiff's name, and then "flickered a light at [Plaintiff]" that began to trigger an epileptic episode in Plaintiff [*Id.* at 7-8].  Officer Perry said, "You listen to me boy!" [*Id*. at 9].  Plaintiff told Officer Perry that he would file a grievance and make Perry lose his job if he did not leave [*Id*.].  Officer Perry taunted Plaintiff and said that he would take Plaintiff's commissary [*Id*.].  However, Officer Perry "eventually gave up" [*Id*.].

On July 21, 2023, at approximately 10:50 p.m., Officer Perry came to Plaintiff's cell door while Plaintiff was urinating, so Plaintiff turned to block Officer Perry from observing the act

[Doc. 6 at 1]. Plaintiff laid down, and Officer Perry stated Plaintiff's name and commanded Plaintiff to say his own name [*Id.*]. Plaintiff remained silent because he "[u]nderst[ood] that [Officer Perry] does things like this to harass" Plaintiff [*Id.*]. Officer Perry then stated, "Dooley[,] I will torture you with my light [flashlight]" [*Id.*]. When Plaintiff advised Officer Perry that he had light sensitivity, Officer Perry stated, "I don't give a fuck" [*Id.*]. Plaintiff asked Officer Perry if he was retaliating against him, and Officer Perry stated that he would be back [*Id.*]. Plaintiff filed a grievance about the event [*Id.* at 1-2].

At 11:06 p.m., Officer Perry returned to Plaintiff's cell door, flashed his light, "and began knocking and clicking a pen while saying [Plaintiff's] name in a way that made [Plaintiff] uncomfortable" [*Id.* at 2]. Plaintiff stated that he would file a Prison Rape Elimination Act ("PREA") alert if Officer Perry did not stop [*Id.*]. Officer Perry left, and Plaintiff filed a complaint [*Id.*]. At 11:57 p.m., Officer Perry began to ring Plaintiff's intercom and call his name "for the sole purpose of harassment" [*Id.* at 2]. Plaintiff did not answer Officer Perry, but Plaintiff filed a grievance [*Id.*].

On July 22, 2023, Officer Perry wrote Plaintiff up on disciplinary charges for a headcount refusal "[i]n retaliation for grievances filed" and because Plaintiff filed the instant action [*Id.* at 2]. Although the facility failed to resolve Plaintiff's grievances on this issue, it served Plaintiff "with a disciplinary advisement on July 25, 2023" [*Id.*]. Plaintiff filed a fourth grievance concerning the facility's failure to act and filed an external PREA complaint on the officer [*Id.*]. Officer Kuban heard witness testimony at a subsequent hearing, but because Officer Perry denied any wrongdoing, Plaintiff was found guilty of the disciplinary charge [Doc. 7 at 1].

On July 24, 2023, at approximately 10:30 p.m., Officer Thornbury did headcount [Doc. 6 at 2]. He referred to Plaintiff and other inmates as "his property" and called them "puppies in

cages" [*Id*.]. Upon coming to Plaintiff's cell door, Officer Thornburry stated his intention to write

Plaintiff up [*Id*. at 3]. Plaintiff asked three times whether Officer Thornburry was retaliating

against him and told Officer Thornburry he was retaliating against Plaintiff for his civil rights suit

[*Id*.]. At 10:45 p.m., Officer Thornburry instructed Plaintiff to "[e]at his dick" [*Id*.]. Plaintiff filed

a grievance and a PREA alert concerning the incident, even though the facility disconnected his

call three times as he was trying to make the external PREA report [*Id*.]. Officer Thornburry

returned to Plaintiff's cell at around 11:15 p.m. and began to repeatedly kick the door while

referring to Plaintiff as "a little bitch" [*Id*.]. He did not do that to any other inmate's door [*Id*.].

More generally, Plaintiff complains that officers look at inmates' charges and discriminate

against them on that basis, in violation of the inmates' rights to equal protection and privacy

[Doc. 5 at 18]. Plaintiff has filed grievances concerning the denial of his request for worker status

"and two for ones to cut [his] sentence in half[,]" which he alleges violates the Tennessee

Constitution and deprives him of equal protection [Doc. 7 at 2]. He also asserts that (1) officers

turn off their body cameras to abuse inmates, [Doc. 5 at 16, 45, 56]; (2) the Inmate Handbook

violates constitutional protections, [Doc. 7 at 2]; (3) officers open legal mail without consent, [*id*.];

and (4) the facility declines or disconnects calls it does not want Plaintiff to make, such as calls to

Plaintiff's family and PREA alerts, [*id*.]. Finally, Plaintiff maintains that the Knox County Sheriff

and his officers do not provide any meaningful response to inmate grievances [Doc. 5 at 8, 16, 58].

Plaintiff filed his Amended Complaint, as supplemented, against Defendants Knox County

Sheriff's Department and related Defendants Knox County Sheriff Tom Spangler; Officers

Anderson, Martinez, Cordova, Thornburry, Perry; Sgt. Hocker; and Nurse Trent

[*See* Docs. 5, 6, 7].[7] Plaintiff also sued the following Defendants who are associated with his Knox County criminal prosecutions: Knox County, Cameron Williams, Jeff Day, Tom Riddle, Scott Green, Hector Sanchez, Mike Hammond, Greg Isaacs, Amelia Walters, Vashti Walters, and Lucid Media [Doc. 5 at 4]. He sues all Defendants in their individual and official capacities [Doc. 5 at 16]. For relief, Plaintiff seeks punitive damages, "[r]estoration of citizenship and exoneration," compensatory damages, and "[r]emoval from the National Sex Offender Registry" [Doc. 5 at 61; Doc. 6 at 4; Doc. 7 at 2].

III.     **Analysis**

A.     **Misjoined Claims**

The gravamen of Plaintiff's Amended Complaint and supplements is his treatment at the Roger D. Wilson Detention Facility [*See* Docs. 5-7]. However, Plaintiff's Amended Complaint also includes numerous claims against a group of Defendants related to his Knox County criminal prosecution—namely, Knox County, Cameron Williams, Jeff Day, Tom Riddle, Scott Green, Hector Sanchez, Mike Hammond, Greg Isaacs, Amelia Walters, Vashti Walters, and Lucid Media [Doc. 5].

Plaintiff's unrelated claims against Defendants associated with his criminal prosecution are not properly joined in this action under Rule 20(a)(2). Plaintiff may join as many claims as he has against an opposing party under Rule 18(a), but Rule 20(a)(2) allows a plaintiff to sue multiple defendants only where "(A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will

_____

[7] Plaintiff initially named Cpl. Harvey as a Defendant [Doc. 5] but later stated his desire "to remove Cpl. Harvey from the suit entirely" [Doc. 7].

15

arise in the action." Fed. R. Civ. P. 20(a)(2). Therefore, Rule 20 does not permit a plaintiff to join unrelated claims against different defendants in one lawsuit. *See, e.g., George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007) ("A buckshot complaint that would be rejected if filed by a free person— say, a suit complaining that A defrauded the plaintiff, B defamed him, C punched him, D failed to pay a debt, and E infringed his copyright, all in different transactions—should be rejected if filed by a prisoner.").

Moreover, Plaintiff filed a separate civil action against the Knox County Defendants associated with his criminal prosecution. *See Dooley v. Knox Cnty.*, No. 3:23-CV-265-JRG-DCP (E.D. Tenn.). Therefore, his allegations against those Defendants in this action are duplicative, and courts attempt to avoid duplicative litigation. *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) ("[T]he general principle is to avoid duplicative litigation.").

Because Plaintiff's allegations against the Defendants associated with his criminal prosecution are improperly joined in this action and duplicative, the Court **DISMISSES** all claims and Defendants (Knox County, Cameron Williams, Jeff Day, Tom Riddle, Scott Green, Hector Sanchez, Mike Hammond, Greg Isaacs, Amelia Walters, Vashti Walters, and Lucid Media) related to Plaintiff's criminal prosecutions. And because exoneration or release from criminal judgment is unavailable in a Section 1983 action, the Court also **DISMISSES** Plaintiff's requests for relief related to his criminal prosecution. *See Preiser v. Rodriguez*, 411 U.S. 475, 490 (1973) ("Congress has determined that habeas corpus is the appropriate remedy for state prisoners attacking the validity of the fact or length of their confinement, and that specific determination must override the general terms of § 1983.").

16

### B. Fourteenth Amendment Pretrial Detention Claims

Between February 24, 2023 and March 3, 2023, before Plaintiff pled guilty, he was a pretrial detainee in the Roger D. Wilson Detention Facility. *See Lawler as next friend of Lawler v. Hardeman Cnty., Tenn.*, 93 F.4th 919, 926 (6th Cir. 2024). As a pretrial detainee, Plaintiff was protected by the Due Process Clause of the Fourteenth Amendment. *Id.* The Due Process Clause protects a pretrial detainee from being "punished prior to an adjudication of guilt." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). However, not every hardship imposed during pretrial detention amounts to "punishment" in the constitutional sense. *Id*. at 537.

Plaintiff challenges the conditions of his confinement. A conditions-of-confinement claim has both an objective and a subjective element. *Spencer v. Bouchard*, 449 F.3d 721, 728 (6th Cir. 2006) (internal citations and quotation marks omitted), *abrogated on other grounds by Jones v. Bock*, 549 U.S. 199 (2007). The objective element requires an allegation of a "sufficiently serious" deprivation. *Id.* "[T]he Constitution does not mandate comfortable prisons." *Rhodes v. Chapman* 452 U.S. 337, 349 (1981). Only allegations of "extreme deprivations" that deny a prisoner "the minimal civilized measure of life's necessities" support a cognizable conditions-of-confinement claim. *See Hudson v. McMillan*, 503 U.S. 1, 8-9 (1992) (citations and quotations omitted). For the subjective element, a jail official may not punish a pretrial detainee through deliberate indifference to the conditions of his confinement. *See Bell*, 441 U.S. at 535. A jail official is deliberately indifferent to a pretrial detainee's conditions of confinement if he acts "deliberately" and at least "recklessly 'in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Brawner v. Scott Cnty.*, 14 F.4th 585, 596 (6th Cir. 2021) (quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)).

Plaintiff complains that during his week of pretrial detention he was not given proper medication, food, recreation, or mental health services [*See* Docs. 5 at 31]. But his pleadings do

not set forth facts that would allow the Court to plausibly infer that any Defendant acted deliberately or recklessly "in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *See Brawner*, 14 F.4th at 596 (cleaned up). And while Plaintiff claims that he only pled guilty because he was deprived food and medication during his pretrial detention, Plaintiff cannot seek monetary damages in a Section 1983 action based on the fact of his incarceration without first demonstrating that his conviction and/or sentence has been reversed or otherwise invalidated. *See Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994) (holding plaintiff must demonstrate unlawfulness of his conviction or confinement prior to pursue Section 1983 suit challenging criminal judgment). There is nothing in the record indicating that Plaintiff's conviction or sentence has been invalidated. Therefore, the Court **DISMISSES** all claims related to Plaintiff's pretrial detention because the relevant pleadings fail to state a claim.

### C.     Eighth Amendment Claims

Plaintiff's allegations regarding prison conditions and punishment at the Roger D. Wilson Detention Facility after his conviction implicate the Eighth Amendment's prohibition against cruel and unusual punishment. *See Lawler*, 93 F.4th at 926.[8] As relevant here, an Eighth Amendment claim, too, has an objective and subjective element. *See Helphenstine v. Lewis Cnty.*, 60 F.4th 305, 315 (6th Cir. 2023). The objective element requires that the alleged deprivation "was serious enough to violate the Constitution." *See id.* (quoting *Griffith v. Franklin Cnty.*, 975 F.3d 554, 567 (6th Cir. 2020)). And the subjective element "requires a plaintiff to show that a defendant 'kn[ew]

---

[8] To the extent that there may be an argument that Plaintiff was a pretrial detainee again from his April 14, 2023 arrest for a violation of probation following his initial conviction and release on probation until his apparent conviction for the probation violation (given the length of continued detention), *see Williams v. Macomb Cnty.*, No. 21-10022, 2023 WL 10676156, *2 (E.D. Mich. Mar. 31, 2023), the results of the Court's analysis would be no different under the Fourteenth Amendment Due Process rubric described above.

18

of and disregard[ed] an excessive risk to inmate health or safety; the official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id.* (alterations in original) (*quoting Farmer*, 511 U.S. at 837)).

"[T]he Constitution does not mandate comfortable prisons[.]" *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981). "Not every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987). Only conditions of confinement that involve "the wanton and unnecessary infliction of pain," that are "grossly disproportionate to the severity of the crime," or that result in the denial of the "minimal civilized measure of life's necessities" violate the Eighth Amendment. *Rhodes*, 452 U.S. at 346-47.

### 1. Conditions Claims

Plaintiff complains that the medical holding cell he was placed in on April 21, 2023, was infested with bugs, smelled of urine, and had a non-functioning toilet and sink [Doc. 5 at 38]. However, Plaintiff's Amended Complaint indicates that Plaintiff was only in the cell for a brief period of time, and he does not allege any facts suggesting that he was exposed to any serious risk of harm from those unpleasant conditions. Therefore, these allegations are not sufficiently serious to be "cruel and unusual" punishment. *See, e.g., Abdur-Raheem-X v. McGinnis*, No. 99-1075, 1999 WL 1045069, at *2 (6th Cir. Nov. 12, 1999) ("[T]he Eighth Amendment does not require that prisoners enjoy immediately available . . . toilets."); *Harris v. Ohio*, No. 1:19-CV-383, 2019 WL 2477354, at *6 (S.D. Ohio June 13, 2019) (concluding that plaintiff's "conclusory allegations that his cell was generally filthy, the ventilation was not properly functioning, [and] bugs were in his cell" did not amount to a deprivation of "the minimal civilized measure of life's necessities"), *report and recommendation adopted*, No. 1:19-CV-383, 2020 WL 3893694 (S.D. Ohio July 10, 2020).

19

The same conclusion applies to the claims that Plaintiff was (1) once denied recreation after being held in a cell for three days, [Doc. 5 at 39]; (2) held in a cell for four days without a shower, the ability to exercise, socialize, or charge tablets to speak with family members, [*id*. at 41]; and (3) denied an extra paper gown while on suicide watch, [*id*. at 55-56, 57]. Petitioner has not alleged any excessive risk of harm as a result of these conditions, and these limited deprivations did not deprive him of "the minimalized civil measure of life's necessities." *See Rhodes*, 452 U.S. at 347; *see also Siller v. Dean*, 205 F.3d 1341, *2 (6th Cir. Feb. 1, 2000) ("six days" without "access to a shower and other (unspecified) personal hygiene items" is "not actionable"); *Williams v. Delo*, 49 F.3d 442, 445-46 (8th Cir. 1995) (holding four-day inmate placement in strip cell without clothes, water, mattress, legal mail, or hygienic supplies did not violate Eighth Amendment); *Whitington v. Ortiz*, No. 07-1425, 2009 WL 74471, at *6 (10th Cir. Jan. 13, 2009) ("Mere discomfort or temporary adverse conditions which pose no risk to health and safety do not implicate the Eighth Amendment."); *Kizer v. Robertson Cnty.*, No. 3:17-CV-00715, 2018 WL 2164557, at *1 (M.D. Tenn. May 10, 2018) ("[T]here is no applicable precedent requiring any minimum amount of outdoor recreation for prisoners." (citing *Argue v. Hofmeyer*, 80 F. App'x 427, 430 (6th Cir. 2003))).

Plaintiff also makes several allegations that he was denied adequate or appropriate food. Specifically, he maintains that (1) he was occasionally given cheese sandwiches despite the fact he is lactose intolerant, [Doc. 5 at 38, 55]; (2) Officer Thornbury crushed Plaintiff's food with his hands and threw the food on Plaintiff's cell floor on one occasion, [*id*. at 56]; and (3) Plaintiff believed Officer Thornbury might have attempted to tamper with his food on one occasion, [*id*. at 58]. Where a prisoner "continues to receive adequate nutrition," he does not suffer cruel or unusual punishment. *See Richmond v. Settles*, 450 F. App'x 448, 4556 (6th Cir. 2011) (allegedly depriving prisoner of seven meals in six days, amounting to at least one meal per day, did not

20

violate the Eighth Amendment because the prisoner "does not allege that his health suffered as a result of the meal deprivation"); *see also Cunningham v. Jones*, 567 F.2d 653, 660 (1977) (noting one meal a day is sufficient when the caloric intake was enough to maintain normal health). And Plaintiff has not alleged that he suffered any serious health effects as a result of the food he was served or the meals he missed. Therefore, the Court **DISMISSES** these claims for failure to state a claim.[9]

### 2.     Disciplinary Segregation Claims

Plaintiff also complains of his placement in "disciplinary classification" or isolation at various times and that he was once housed in disciplinary segregation for three days with two other people in a one-man cell [Doc. 5 at 39]. The Court liberally construes these allegations to seek to assert a claim for overcrowding and a claim for misplacement in segregation.

To the extent Plaintiff intends to allege a claim for overcrowding based on his three-day placement in segregation, the Supreme Court and the Sixth Circuit have held that overcrowding, standing alone, is not a violation of the Constitution. *See Rhodes,* 452 U.S. at 347-48; *Agramonte v. Shartle*, 491 F. App'x 557, 560 (6th Cir. 2012). To support an overcrowding claim, a prisoner must allege that the overcrowding resulted in "deprivations denying 'the minimal civilized measure of life's necessities[.]'" *Wilson v. Seiter*, 501 U.S. 294, 298 (1991) (citing *Rhodes*, 337 U.S. at 347). Plaintiff has not alleged that overcrowding denied him "a basic human need, such as food, shelter, or warmth;" therefore his allegation that the facility housed three inmates in a one-man cell fails to state a plausible Section 1983 claim. *See Starnes v. Green Cnty. Sheriff's Dep't*,

---

[9] Plaintiff's allegation that he believes Officer Thornburry may have attempted to tamper with his food is also independently impermissibly conclusory to state a claim. *See Smith v. Gen. Motors, LLC*, 988 F.3d 873, 885 (6th Cir. 2021) (holding that even complaints made "on information and belief" cannot rest on conclusory allegations, but rather, "must set forth a factual basis for such belief").

No. 2:08-CV-244, 2010 WL 2165368, at *5 (E.D. Tenn. May 26, 2010). And even if Plaintiff was denied recreation during this period, a limited denial of recreation time does not, alone, raise constitutional issues. *See Kizer*, 2018 WL 2164557, at *1.

Further, mere "placement in segregation" does not establish an Eighth Amendment claim because it is "a routine discomfort that is part of the penalty that criminal offenders pay for their offenses against society[.]" *See Harden-Bey v. Rutter*, 524 F.3d 789, 795 (6th Cir. 2008) (quoting *Murray v. Unknown Evert*, 84 F. App'x 553, 556 (6th Cir. 2003)). Plaintiff does not allege that he was denied basic human needs while in segregation. *See Rhodes*, 452 U.S. at 347-48. Therefore, the Court **DISMISSES** Plaintiff's Eighth Amendment claims relating to overcrowding or segregation.

### 3. Harassment And Threat Claims

Plaintiff contends that various Defendants used racial slurs and derogatory, insulting language to refer to him; threatened him with physical violence; harassed him; and mocked him [Doc. 5 at 38, 41, 43, 45, 46]. Threatening and abusive speech, while unprofessional and unacceptable, does not constitute "punishment" in the constitutional sense. *See Ivey*, 832 F.2d at 955 (holding "verbal abuse" and "harassment" do not raise a constitutional issue); *Jones Bey v. Johnson*, 248 F. App'x 675, 677 (6th Cir. 2007) (concluding that the occasional use of racial slurs, "although unprofessional and reprehensible, does not rise to the level of constitutional magnitude") (quoting *Corsetti v. Tessmer*, 41 F. App'x 753, 755-56 (6th Cir. 2002)); *Owens v. Johnson*, No. 99-2094, 2000 WL 876766, at *2 (6th Cir. June 23, 2000) ("The occasional or sporadic use of racial slurs, although unprofessional and reprehensible, does not rise to a level of constitutional magnitude."). Therefore, the Court **DISMISSES** Plaintiff's claims related to harassment and threats for failure to state a claim.

### 4.    Excessive Force Claims

Plaintiff's allegations that (1) Officer Thornburry threw an orange at Plaintiff's groin, [Doc. 5 at 56]; (2) Officer Perry "flicked" and "flashed" his flashlight at Plaintiff on various occasions, [Docs. 5 at 7-8, 6 at 1-2]; and (3) Officer Cordova turned on all the cell lights on June 4, 2023, [Doc. 5 at 45]; are best analyzed as excessive force claims.  In assessing a claim, courts apply a two-part inquiry:  (1)subjectively,  "whether force was applied in a good faith effort to maintain and restore discipline or maliciously and sadistically for the very purpose of causing harm;" and (2) objectively, whether the conduct, in context, is sufficiently serious to offend "contemporary standards of decency."  *Hudson*, 503 U.S. at 6, 9.

Officer Thornburry merely throwing an orange at Plaintiff's groin is the type of *de minmis* use of force that, while unseemly, does not implicate constitutional protections.  *See Wilkins v. Gaddy*, 559 U.S. 34, 37-38 (2010) (noting *de minimis* use of physical force that is not "repugnant to the conscience of mankind" does not implicate the Eighth Amendment, and that "a push or shove that causes no discernable injury almost certainly fails to state a valid excessive force claim" (quoting *Hudson*, 503 U.S. at 8-9) (quotation marks omitted))).  And Plaintiff's allegation that Officer Perry "flicked" and "flashed" his flashlight at him is insufficient to plausibly allege that Officer Perry acted "maliciously and sadistically for the very purpose of causing harm" to Plaintiff. *Hudson*, 503 U.S. at 6.  While Plaintiff complains that Officer Perry was made aware of Plaintiff's light sensitivity and threatened to "torture" him with the light, Plaintiff also confirms that he ignored Officer Perry's commands on two occasions at around 11:00 p.m. because (1) Plaintiff would not come to the cell door for headcount, and (2) Plaintiff refused to answer Officer Perry's command that he state his name [*See* Doc. 5 at 7-8; Doc. 6 at 1-2].  There are no factual allegations suggesting that Officer Perry's use of the flashlight was prolonged on those two occasions or that

Plaintiff suffered any harm as a result.[10]  And Plaintiff's allegation that on June 4, 2023, Officer Cordova turned on all the lights in all the cells for an undetermined period of time, which "triggered" Plaintiff's sensitivity to light, fails to state a plausible Section 1983 claim for excessive force, because it is not sufficiently serious to offend contemporary standards of decency. Therefore, the Court **DISMISSES** Plaintiff's excessive force claims for failure to state a claim.

### 5.      Medical Care Claims

Plaintiff alleges that he had a seizure on April 21, 2023, because "medical staff" had not given his prescription medication since his arrest for a probation violation on April 14, 2023 [Doc. 5 at 37-38].  Nurse Trent restarted those prescriptions after Plaintiff's seizure [*Id*. at 39].  He also claims that he was denied his evening medication on May 7, 2023, after a non-party "nurse was upset she could not hear [Plaintiff] say[ing] [his] name" [*Id*. at 40].  Finally, he claims Officer Anderson denied his request for anxiety medication or to see mental health professionals after he was thrown in "the hole" on June 4, 2023 [*Id*. at 45].

Plaintiff's allegations regarding the denial of medical services on May 7, 2023 and June 4, 2023 are insufficient to allow a plausible inference that Plaintiff was exposed to a sufficiently serious risk of harm by the alleged denial of medical care.  *See Stewart v. Bailey*, No. 1:22-CV-1018, 2023 WL 236530, at *8 (W.D. Mich. Jan. 18, 2023) (collecting cases and holding that the occasional missed dose of medication does not give rise to constitutional claim).  However, Plaintiff has alleged just enough facts to permit the Court to infer that Nurse Trent was part of the "medical staff," [*see* Doc. 5 at 37], and violated Plaintiff's rights by (1) prolonging the start of

---

[10] Plaintiff maintains that the flickered flashlight "began" to trigger an epileptic episode [Doc. 5 at 9].  But Plaintiff alleges no facts to indicate that he did experience an epileptic episode or suffer any other serious ill effects.

Plaintiff's prescription medication, which resulted in a seizure, and (2) failing to render specific adequate treatment following Plaintiff's seizure. Therefore, Plaintiff's discrete medical care claim against Defendant Nurse Trent may **PROCEED**, and the Court **DISMISSES** the remainder of Plaintiff's medical care claims.

### 6. Failure to Protect Claims

Liberally construed, Plaintiff's failure to protect claims are based on his allegations that (1) officers moved inmate Sanderson to "the hole," where Plaintiff was located, after Plaintiff filed a grievance that he was incompatible with Sanderson, [Doc. 5 at 44], and (2) Officer Anderson told other inmates that Plaintiff was a rapist "to get them to target" Plaintiff, [*id*. at 18, 45]. Prison officials have a duty to protect inmates from violence by other inmates and must take reasonable measures to protect their safety. *Farmer*, 511 U.S. at 832-33. But Plaintiff has not alleged facts that allow the Court to plausibly infer that Sanderson's transfer to "the hole" was in deliberate disregard to a substantial risk of serious harm to Plaintiff. Plaintiff maintains that he was given the option of going into protective custody when he made officials aware of his desire to be separated from Sanderson, but he declined that option [Doc. 5 at 44]. Therefore, officials did not act with deliberate indifference to Plaintiff's concerns, even if Plaintiff found the ultimate solution unsatisfactory. However, Officer Anderson's purported announcement to other inmates that Plaintiff was a "rapist" is on the other side of the law. Accordingly, the Court **DISMISSES** any claim related to Sanderson's placement in "the hole" with Plaintiff, but Plaintiff's failure to protect claim against Officer Anderson related to his announcement may **PROCEED**.

### C. Other Fourteenth Amendment Due Process Claims

Plaintiff also maintains that Defendants violated his due process rights by (1) giving him frivolous disciplinary write-ups, [Doc. 5 at 6, 15]; (2) failing to adequately address grievances, [*id*. at 8, 16, 58]; (3) not returning his $10 medical fee, [*id*. at 40]; (4) advising other inmates of the

charges against him, [*id*. at 18]; and (5) denying him the opportunity to work and earn sentencing credits, [Doc. 7 at 2]. To implicate due process, Plaintiff must demonstrate a "liberty" interest that is protected by the Due Process Clause. *See Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) ("[T]he Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish one of these interests at stake."). Plaintiff may show that he has a qualifying "liberty" interest where his restraint "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *See Sandin v. Conner*, 515 U.S. 472, 484 (1995).

### 1. Disciplinary Write-Ups

Plaintiff complains that he was given frivolous disciplinary write-ups for a physical altercation, [Doc. 5 at 43, 44]; theft, [*id*. at 6]; and a headcount refusal, [Doc. 6 at 2]. However, inmates possess no right to be free from charges or convictions for disciplinary offenses. *Wolff v. McDonnel*, 418 U.S. 539, 564-71 (1974). This is true even if the charge later turns out to be unfounded. *See Cromer v. Dominguez*, 103 F. App'x 570, 573 (6th Cir. 2004) ("False accusations of misconduct filed against an inmate do not constitute a deprivation of constitutional rights where the charges are subsequently adjudicated in a fair hearing."); *Person v. Campbell*, No. 98-5638, 1999 WL 454819, at *1 (6th Cir. June 21, 1999) ("[T]he filing of false disciplinary charges against an inmate does not constitution a constitutional violation redressable under § 1983."). Nor did any temporary placement in isolation or disciplinary segregation as a result of these write-ups qualify as a protected liberty interest because these conditions are not an "atypical and significant hardship." *See Sandin*, 515 U.S. at 486 (finding confinement in disciplinary segregation for twenty-three hours per day "did not present the type of atypical, significant deprivation in which the state might conceivably create a liberty interest"); *Harris v. Truesdell*, 79 F. App'x 756, 758 (6th Cir. 2003) (punishment of sixty days in punitive segregation did not give rise to protected

liberty interest). Therefore, the Court **DISMISSES** all claims relating to Plaintiff's disciplinary write-ups and related discipline.

### 2. Grievance Procedure Claims

Plaintiff alleges that the grievance procedure at the Roger D. Wilson Detention Facility is ineffective [Doc. 5 at 8, 16, 58]. However, Plaintiff does not have a constitutional right to an effective grievance procedure. *Argue*, 80 F. App'x at 430 (providing that a prisoner has "no inherent constitutional right to an effective prison grievance procedure"); *Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996) ("Accordingly, a state's inmate grievance procedures do not give rise to a liberty interest protected by the Due Process Clause."). Accordingly, the Court **DISMISSES** Plaintiff's grievance procedure claims.

### 3. Property Claim

Plaintiff complains that he was charged a $10 sick call fee in connection with his trip to medical following his seizure [Doc. 5 at 40]. It is not unconstitutional to charge inmates a fee for health care, provided indigent inmates are not refused care because of their inability to pay. *See White v. Corr. Med. Servs*., 94 F. App'x 262, 264 (6th Cir. 2004). To the extent Plaintiff seeks relief for an allegedly improper fee collection, the Supreme Court has held that the Due Process Clause is not violated when a State employee deprives an individual of property, provided that the State makes a meaningful post-deprivation remedy available. *See Parratt v. Taylor*, 451 U.S. 527, 543 (1981)*, overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986); *see also Hudson v. Palmer*, 468 U.S. 517, 533 (1984) (extending *Parratt*'s holding to intentional deprivations of property). And Plaintiff has not alleged that Tennessee's post-deprivation procedures are inadequate to address his alleged wrong. *See Vicory v. Walton*, 721 F.2d 1062, 1063 (6th Cir. 1983). In fact, Tennessee law provides for the recovery of personal property. *See McQuiston v. Ward*, No. 2001-201-COA-R3-CV, 2001 WL 839037, at *1 (Tenn. Ct. App. July

25, 2001) (citing to Tenn. Code. Ann. § 29-30-101 and § 29-30-201).  Accordingly, the Court **DISMISSES** Plaintiff's property claim.

### 4.    Privacy Claim

Plaintiff claims that Defendants violated his "ninth" Amendment right to privacy by reviewing his charges and sharing with other inmates [Doc. 5 at 18].  But the Ninth Amendment "does not confer substantive rights in addition to those conferred by other portions of our governing law."  *Gibson v. Matthews*, 926 F.2d 532, 537 (6th Cir. 1991).  Therefore, he cannot state a Ninth Amendment claim.  But liberally construing the pleadings, "zones of privacy" have, at times, been recognized under the Fourteenth Amendment.  *Paul v. Davis*, 424 U.S. 693, 712-13 (1976).  The Supreme Court has noted an "individual interest in avoiding disclosure of personal matters."  *See Whalen v. Roe*, 429 U.S. 589, 599 (1977).  However, arrest records are public records, not personal matters.  *See Paul P. v. Verniero*, 170 F.3d 396, 403 (3d Cir.1999) (finding "arrest records and related information are not protected by a right to privacy"); *Cline v. Rogers*, 87 F.3d 176, 179 (6th Cir.1996) (holding sheriff's alleged disclosure of plaintiff's arrest record to a third party did not give rise to a federal constitutional claim, "since arrest and conviction information are matters of public record").  Without more, this claim cannot stand under the law.  Accordingly, the Court **DISMISSES** Plaintiff's privacy claim.

### 5.    Work and Credit Claim

Plaintiff maintains that he has been denied worker status "and two for ones to cut [his] sentence in half[,] in violation of Tennessee law" and his "right to work as a convicted inmate" [Doc. 7 at 2].  But Plaintiff has no constitutional right to employment, *Argue*, 80 F. App'x at 429 ("Prisoners have no constitutional right to rehabilitation, education, or jobs."), or to earn or receive sentence credits, *Hansard v. Barett*, 980 F.2d 1059, 1062 (6th Cir. 1992) ("inmates have no inherent constitutional right to good time credit").  Nor does Tennessee law create a right to earn

such credits—the award of credits is discretionary. *See* Tenn. Code Ann. § 41-21-236(a)(2) (providing inmate "*may* be awarded time credits" (emphasis added)). Accordingly, the Court **DISMISSES** this claim.

### D. Contact Claims

Plaintiff also alleges that his phone calls are disconnected by the facility [Doc. 7 at 2], and that sometimes inmates are not allowed to use the telephone or tablets to make calls when they are locked in their cells [Doc. 5 at 19]. In the same vein, he alleges that he "was being denied contact with [his] Nashville attorney" for some indeterminate period of time [*Id*. at 40]. The Court addresses these claims by the Amendment implicated.

#### 1. First Amendment

The First Amendment provides that "Congress shall make no law … abridging the freedom of speech." U.S. Const. amend I. But "lawful incarceration results in the necessary limitation of many privileges and rights of the ordinary citizen." *Hill v. Estelle*, 537 F.2d 214, 215 (5th Cir. 1976) (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). A prisoner's "free speech rights are uncontrovertedly limited by the virtue of their incarceration." *Thaddeus-X v. Blatter*, 175 F.3d 378, 393 (6th Cir. 1999).

The First Amendment protects Plaintiff's right to communicate with those outside prison, but it does not give him a per se right to use a telephone at a particular time to do so. *See United States v. Footman*, 215 F.3d 145, 155 (1st Cir. 2000) ("Prisoners have no per se constitutional right to use a telephone[.]"); *Washington v. Reno*, 35 F.3d 1093, 1099 (6th Cir. 1994) ("While prisoners retain the right to communicate with friends, family, and counsel while in prison, they do not have a right to unlimited telephone calls."); *Miles v. Scanlon*, No. 1:21-CV-74, 2021 WL 1809834, at *5 (W.D. Mich. May 6, 2021) (holding prisoners "do not have a constitutional right to a particular form of communication" under the First Amendment). Here, Plaintiff does not allege that he

29

received no telephone access nor does he allege that he could not communicate with others due to the access limits or deficiencies he raises. Accordingly, the Court **DISMISSES** any First Amendment contact claims.

### 2. Sixth Amendment

Plaintiff's claim regarding contact with his attorney may also implicate the Sixth Amendment. The mere denial of the right to call or otherwise consult with counsel does not necessarily constitute a constitutional violation. *See Stamper v. Campbell Cnty.,* 415 F. App'x 678, 680 (6th Cir. 2011). Further, it is not clear from the pleadings whether Plaintiff sought contact with his attorney on a pending criminal charge, or on a civil or post-conviction matter. "There is no abstract, free standing right to full and unfettered access to contact with legal counsel for post-conviction and civil matters." *Rouse v. Washington*, No. 20-CV-11409, 2021 WL 2434196, at *6 (E.D. Mich. June 15, 2021) (citing *Lewis v. Casey*, 518 U.S. 343, 351 (1996)). In those cases, to state a claim, Plaintiff must demonstrate some actual legal injury because of the purportedly hindered access. *Id*. The pleadings contain no such facts. To the extent Plaintiff sought to contact his counsel regarding a pending criminal matter, there are no facts suggesting that he was denied access to his counsel at a critical stage of his criminal proceedings, as is required to state a claim of constitutional error on the theory alleged. *See United States v. Cronic*, 466 U.S. 648, 659 n.25 (1984). Accordingly, the Court **DISMISSES** any Sixth Amendment contact claims.

### E. Policy And Institutional Rule Claims

Plaintiff claims that certain rules in the Inmate Handbook at the detention facility are unconstitutionally overbroad [Doc. 5 at 7; Doc. 7 at 2]. He also maintains that officers routinely turn off their body cameras, which is purportedly "illegal" [*See* Doc. 5 at 16, 43, 45, 56, 59, 60]. An alleged overbroad definition in the Inmate Handbook fails to state a constitutional claim because the facility's policies are not matters of federal law. *See Lugar v. Edmondson Oil Co*.,

457 U.S. 922, 924 (1982) (holding claims under Section 1983 can only be brought for "deprivation of rights secured by the constitution and laws of the United States"). And the Court could not locate any constitutional requirement for officers to wear body cameras, let alone leave them on at all times. To the extent the facility's policies or rules require as much (which has not been alleged), the violation of institutional policies or rules, alone, fails to raise a constitutional claim. *See Stanley v. Vining*, 602 F. 3d 767, 769 (6th Cir. 2010) (stating that "[i]t has long been established that violation of a state statute or regulation is insufficient alone to make a claim cognizable under § 1983"). Accordingly, the Court **DISMISSES** these claims.

### F.    Mail Claims

Plaintiff contends that (1) Officer Anderson once did not initially give him his mail when he asked for it, [Doc. 5 at 8]; (2) Officer Anderson has given Plaintiff's mail to other inmates before, [*id*]; and (3) officers open legal mail without inmate consent, [Doc. 7 at 2]. A prisoner has a First Amendment right to receive and send mail, subject to reasonable limitations for "legitimate penological objectives." *Sallier v. Brooks*, 343 F.3d 868, 873-74 (6th Cir. 2003). For "legal mail," prison officials may be required to open it and inspect it for contraband in the prisoner's presence, *Wolff*, 418 U.S. at 576-77, "if such a request" to be present "has been made by the prisoner[,]" *Sallier*, 343 F.3d at 874. Generally, constitutionally protected "legal mail" must be "properly and clearly marked." *Kensu v. Haigh*, 87 F.3d 172, 174 (6th Cir.1996). Plaintiff's allegations regarding the approximately five-minute delay in delivery of mail and inadvertent delivery of mail to another prisoner, alone, do not state a claim under this law. And Plaintiff has not alleged that he requested that his legal mail be opened in his presence. Accordingly, the Court **DISMISSES** these mail claims.

## G. Equal Protection Claims

Plaintiff, a black man, maintains that Defendants have violated his right to equal protection of the law by (1) denying his requests to be moved to an empty cell while granting white inmates' requests, [Doc. 5 at 39]; (2) transporting white inmates out of county to resolve their criminal charges while refusing to issue him transport orders, [*id.*]; (3) failing to detain Inmate Sanderson after his alleged altercation with Plaintiff while Plaintiff was detained, [*id.* at 43]; (4) giving a white inmate an extra gown and toilet paper in the suicide cell while denying Plaintiff an extra gown, [*id.* at 56]; (5) not disciplining white inmates for theft but disciplining Plaintiff for theft, [*id.* at 6]; (6) allowing white inmates to clean the pod while denying Plaintiff's request to do so, [*id.* at 8]; (7) looking up inmates' charges and discriminating against them, [*id.* at 18]; and (8) denying Plaintiff the right to work, [Doc. 7 at 2].

To state a viable equal protection claim, "a plaintiff must adequately plead that the government treated the plaintiff 'disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis.'" *Ctr. For Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (quoting *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby, Mich.*, 470 F.3d 286, 299 (6th Cir. 2006)). Race is a "suspect class." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). To establish a race-based equal protection claim, a prisoner must show that "(1) 'he is similarly situated with other prisoners who received' more favorable treatment; and (2) his discriminatory treatment was based on . . . race." *Jones v. Ray*, 279 F.3d 944, 946-47 (11th Cir. 2001) (quoting *Damiano v. Fla. Parole & Prob. Comm'n*, 785 F.2d 929, 932-33 (11th Cir. 1986)). To satisfy this standard, a Plaintiff must be "similarly situated" to his comparators in "all relevant respects." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992); *see also Paterek v. Vill. of Armada*,

801 F.3d 630, 650 (6th Cir. 2015) ("'Similarly situated' is a term of art—a comparator . . . must be similar in 'all relevant respects.'").

Plaintiff's allegations that white inmates are allowed to move cells, attend out-of-county hearings, avoid detention following an altercation, escape discipline for theft, and clean the pod (while he is not) are insufficient to state an equal protection claim, because "mere disparate impact is not sufficient to state an equal protection claim under § 1983." *Weberg v. Franks*, 229 F.3d 514, 528 (6th Cir. 2000). There must also be proof of a discriminatory intent. *Copeland v. Machulis*, 57 F.3d 476, 480 (6th Cir. 1995). Plaintiff has not alleged any facts that would allow the Court to infer that these events were racially motivated, and he has not presented facts demonstrating that the inmates treated more favorably were similarly situated to him in all relevant respects. "[V]ague, conclusory allegations of racial discrimination are not enough to state an equal protection claim." *Jackson v. Madery*, 158 F. App'x 656, 659 (6th Cir. 2005), *abrogated on other grounds by Maben v. Thelen*, 887 F.3d 252 (6th Cir. 2018). Further, he has not presented any facts suggesting that race was a motivating factor in denying Plaintiff employment or in guards looking up his charges, and he has not alleged persons not subjected to the same treatment were of a different race and similarly situated. *See Nali v. Ekman,* 355 F. App'x 909, 913 (6th Cir. 2009) (stating that a claim for race discrimination in prison discipline must be supported by allegations "that the people *not* disciplined were similarly situated and of a different race" to state an Equal Protection claim (emphasis in original)).

But Plaintiff's allegations about his treatment in the suicide cell are different. Plaintiff alleges that, while he was in the suicide cell, Officer Thornburry called him a "little black b***h" and denied him an extra gown but gave an extra gown and toilet paper to a white inmate [*See* Doc. 5 at 56]. Liberally construed, these allegations state a plausible equal protection claim against Officer Thornburry regarding Plaintiff's treatment in the suicide cell. Accordingly, Plaintiff's

33

discrete equal protection claim against Officer Thornburry regarding Plaintiff's treatment in the suicide cell may **PROCEED.**  The Court **DISMISSES** Plaintiff's other equal protection claims.

### H. Retaliation Claims

Plaintiff generally states that he is "repeatedly harassed and retaliated against by staff for filing grievances, reports, and complaints on them" [Doc. 6 at 3].  Specifically, he states that Officer Thornburry threatened to give him a disciplinary charge, kicked his door, and referred to him as "a little bitch," [*Id.* at 2-3].  And after Plaintiff filed various grievances and this lawsuit, Officer Perry began to harass him and placed him on disciplinary restriction for a headcount refusal [Docs. 6 at 1-2; 7 at 2].  To state a viable retaliation claim, Plaintiff must show that (1) he "engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct."  *See Thaddeus-X*, 175 F.3d at 394.  To satisfy the "adverse action" requirement, a prison inmate must show more than *de minimis* harm; he must allege facts showing that "the adverse action is one that would 'deter a person of ordinary firmness' from the exercise of the right at stake."  *Id.* at 396 (quoting *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)).  Plaintiff's subjective belief that he has been retaliated against is insufficient to state a claim.  *Johnson v. Rodriguez,* 110 F.3d 299, 310 (5th Cir. 1997).

A prisoner has a protected First Amendment right to file non-frivolous grievances, provided that he exercises that right in accordance with legitimate prison regulations and/or penological objectives.  *Maben*, 887 F.3d at 265; *Hill*, 630 F.3d at 472; *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001).  The Court presumes that Plaintiff's grievances were non-frivolous.  However, Plaintiff's general complaint that he has been repeatedly retaliated against based on the exercise of this right is conclusory and it fails to state a claim.  *See Hill*, 630 F.3d at

34

475 (holding "conclusory allegations of [a] retaliatory motive unsupported by material facts will not be sufficient" to state a § 1983 claim); *see also Cantley v. Armstrong*, 391 F. App'x 505, 507 (6th Cir. 2010) ("'bare allegations of malice on the defendants' parts are not enough to establish retaliation claims' that will survive § 1915A screening" (quoting *Lewis v. Jarvie*, 20 F. App'x 457, 459 (6th Cir. 2001))). And Plaintiff's nondescript complaint that Officer Thornburry threatened and harassed him in retaliation for his protected conduct, without more, is the kind of general, minor harassment that would not "'deter a person of ordinary firmness' from the exercise of the right at stake." *See Thaddeus-X*, 175 F.3d at 396 (quoting *Bart*, 677 F.2d at 625).

As to Officer Perry, even presuming that a disciplinary restriction is a sufficiently adverse action, Plaintiff was given a disciplinary restriction after he refused headcount [*See* Docs. 6 at 1-2; 7 at 2]. Plaintiff cannot sustain a retaliation claim where, even by his own account, his failure to comply with applicable rules caused the alleged adverse action. *See Bruggeman v. Paxton*, 15 F. App'x 202, 204 (6th Cir. 2001) (rejecting equal protection claim where inmate's pleadings show disciplinary action was based on his violation of prison rules). Therefore, the Court **DISMISSES** these claims.

## I.    Knox County Sheriff's Department

Plaintiff named the Knox County Sheriff's Department as a Defendant in this lawsuit [*See* Doc. 5]. The Sheriff's Department is not a "person" for purposes of Section 1983. *See Anciani v. Davidson Cnty. Sheriff Office*, No. 3:19-CV-169, 2019 WL 1002503, at *2 (M.D. Tenn. Feb. 28, 2019) ("It is well established that in Tennessee federal courts, a sheriff's office or police department is not a 'person' subject to suit under 42 U.S.C. §1983." (citing *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994))). But liberally construing the pleadings, by suing the Knox County Sheriff's Department and other Defendants in their official capacities, Plaintiff essentially

35

seeks to sue Knox County itself. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (holding "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity").

But Plaintiff has not set forth any proof that a custom or policy of Knox County caused any of the actions that support his surviving claims. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) (holding that a municipality may be liable under Section 1983 where its official custom or policy causes a constitutional rights violation). And to the extent that any Knox County employee had was involved in the actions that support a surviving claim, Knox County cannot be liable based solely on the actions of an employee. *See Monell*, 436 U.S. at 691 (finding that liability under Section 1983 may not be imposed merely because a defendant "employs a tortfeasor"); *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006) ("Plaintiff must show that the supervisors somehow encouraged or condoned the actions of their inferiors."). Accordingly, the Court **DISMISSES** the Knox County Sheriff's Department (and any derivative claims against Knox County) and all official-capacity claims.

## IV. Conclusion

For the reasons set forth above:

1. Plaintiff's claims for (1) denial of adequate medical care against Nurse Trent, (2) failure to protect against Officer Anderson, and (3) violation of equal protection by Officer Thornburry may **PROCEED** against these Defendants in their individual capacities;

2. The Court **DIRECTS** the Clerk to send Plaintiff service packets (a blank summons and USM 285 form) for Defendants Trent, Anderson, and Thornburry;

3. Plaintiff **MUST** complete the service packets and return them to the Clerk's Office within twenty-one (21) days of entry of this Order;

4. At that time, the summonses will be signed and sealed by the Clerk and forwarded to the U.S. Marshal for service, *see* Fed. R. Civ. P. 4(c)(3);

5. The Court **WARNS** Plaintiff that if he fails to timely return the completed service packets, the Court will dismiss this action;

36

6.     The remaining Defendants **SHALL** answer or otherwise respond to the Amended Complaint, as supplemented, within twenty-one (21) days from the date of service. If any Defendant fails to timely respond, the Court may enter judgment by default against that Defendant; and

8.     Plaintiff **MUST** immediately inform the Court and remaining Defendants, or their counsel of record, of any address changes in writing.  Pursuant to Local Rule 83.13, it is the duty of a pro se party to promptly notify the Clerk and the other parties to the proceedings of any change in his address, to monitor the progress of the case, and to prosecute or defend the action diligently.  E.D. Tenn. L.R. 83.13.  Failure to provide a correct address to this Court within fourteen (14) days of any change in address may result in the dismissal of this action.

**SO ORDERED**.

**ENTER:**

                         s/ Katherine A. Crytzer
                        KATHERINE A. CRYTZER
                        United States District Judge